John Ethen Jacobs
1504 Colt Ridge Ln
Mableton, Ga., 30126
(678)-949-8519
(404)-615-3866

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

NOV **2 9** 2018

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

## UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| John E Jacobs, )<br>          Plaintiff, )<br> )<br> )<br> )<br>     vs. )<br> )<br> )<br>Cobb County, Cobb County Board of )<br>Commissioners, Cobb County Sheriff )<br>Neil Warren, Major Michael Skelton, )<br>Sergeant Simms, Deputy Miller, )<br>Deputy Calfee-Vittetoe, Deputy who )<br>interviewed me before going to )<br>solitary, Assistant Solicitor Chris )<br>Lanning, Assistant Solicitor Mimi )<br>Scaljon, Public Defender John A )<br>Hildebrand,  Public Defender Cliff )<br>Grainger. In Individual and Official )<br>capacities. )<br> )<br>          Defendant(s) ) | Case No. 18-CV-1686-AT<br><br><br><br><br><br><br>**AMENDED COMPLAINT FOR**<br>**VIOLATIONS OF CIVIL RIGHTS** |

## COMPLAINT

1.     This civil rights action seeks compensatory and punitive relief for damages arising from the violation of civil rights, the wrongful arrest and malicious prosecution and assault and battery of the plaintiff. The defendants demonstrated official policies, patterns, practices, and customs that manifested not only because of intentional discrimination, but also because of systemic failure to recognize or even care about basic principles of due process, and reckless disregard for human life and liberty.

## JURISDICTION

2.     Jurisdiction is invoked pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. 1343 (Civil Rights and Elective Franchise) because Plaintiffs claims arise pursuant to 42 U.S.C. § 1983, et seq. (conspiracy for deprivation of constitutional civil rights).

3.     Plaintiff provided sufficient ante litem notice pursuant to O.C.G.A. §§ 36-11-1, O.C.G.A. 36-33-5 et seq.

4.    Pursuant to 28 U.S.C. § 1367, this court has supplemental jurisdiction over Plaintiff s claims arising under state law because the claims are so related to claims in this action within the Court's original jurisdiction that they form part of the same case and controversy.

5.    Defendants reside within the Northern District of Georgia. All actions alleged herein occurred within the Northern District of Georgia. Venue it this district is proper for Defendants under 28 U .S .C. § 1391(b) & (c).

## ALLEGATIONS

6.

7.    I was not notified of court causing a bench warrant on 11/15/2014. My own research showed that the court was told not to call me in and that the request to "don't call in" was never rescinded. (See Cobb Complaint and Cobb Police complaint exhibit 2 Call Status) afterwards I spent a total of ten months in Cobb jail. After my arrest in Smyrna I spent nine continuous months in jail housed in a cell with approximately 40 other prisoners. There was a gang fight in another area so about 30 gang members were moved into my cell for a total of 70 inmates.

8.     Most prisoners were black, about five were white but Hispanic prisoners
were labeled white, according to the jail wrist bands they wore.

9.     I had not been convicted of a crime, but I spent more time in jail than real
criminals. And it was not just my time in jail but the cruelty I was subjected
to by the guards, particularly Deputy Miller. My younger sister died 10 days
before I was arrested, which added another burden.

10.     I was sick when I was jailed and I got sicker. I had to pay for medical
treatment, if it could be called that, I had to pay for OTC medication and I
usually had to wait a month to be seen. I was charged $5 for each medical
visit and the medications for a total of $20. I did not see a doctor.

11.     The food was terrible. It was unhealthy, unappetizing and insufficient
quantity. The food was so bad and the portions so tiny I lost weight while in
jail, and I was not fat when I went in. Breakfast was usually a small bowl of
expired cereal, sometimes the milk was bad, and a small packet of instant
coffee and sugar. Lunch was bologna on 2 pieces of white bread with a small

packet of tasteless oil. Supper was usually spaghetti that had no flavor. A small packet of Kool-Off, which may have been privately contracted with the sheriff, came with meals. Coffee, tea or other drinks had to be bought at the commissary. Water was from a fountain attached to a metal toilet. Sunday we had pancakes (plastic cakes). Twice a week we had grits and powder eggs. A few times a month we were given some slices of fruit. I traded some of my food for the healthier option of fruit.

12.    My father and brother-in-law gave me $60; which I had to stretch over the nine months, for the commissary after the Smyrna arrest. It was infuriating when guards took away food, pens, paper or other supplies I bought at the commissary with the little money I had.

13.    The guards were too lazy and uncaring to distribute toilet tissue, soap, deodorant or toothpaste from the storeroom. Instead, we were expected to buy these items from the commissary. Dental floss was not allowed. I used threads from a towel for floss. If I had been discovered I would have been charged with criminal/malicious damage and forced to pay $35 for a towel, so I was discrete.

14.    We were issued used prison clothes. This included used underwear and

socks. We were issued one pair of used shower sandals for shoes which were

terribly uncomfortable to wear on the concrete floors. I was in jail so long

the shoes began to wear away; the guard would not give me a new pair

instead they would always make excuses. It got to the point where I had to

use the plastic bag our sack lunches came in to make a lace to tie the shower

shoes together.

15.    When I finally got the opportunity to get new sandals, I thought the green

color on them was paint. It turned out to be fungus or mold. After two weeks

my feet became infected and I needed medical treatment.

16.    It took another two weeks to get medical help. I wrote a humorous letter

to get the nurse's attention. She brought medication with her; otherwise it

would have taken another two weeks to see a doctor, if the nurse approved

it.

17.    The judge saw how we were dressed, including the shower sandals. No

one cared.

18.  We had to request haircuts, but nothing came of it, just like all my other requests. I've always kept my hair short, but after five months in jail my hair and beard had grown long.

19.  We were supposed to get an hour a day outside in the yard for air and sunlight, but we never got close to that.

20.  Not getting fresh air or seeing daylight was bad enough, but something that may permanently affect my health was the three times a month radiation dose we received from the Rapiscan body scanners when we came back from waiting for court. The Forbes article "TSA Abandons Rapiscan's Nude Body Scanners" says that the Transportation Security Agency has stopped using these machines and each machine costs $180,000. The article says these machines are used in maximum-security prisons. I was in a county jail.

21.  Shake downs by guards happened once or twice a week. In a shake down, 20 to 25 guards suddenly rushed into the cell screaming and yelling, often while we were asleep. We were body searched then herded into the recreation area. During those searches our sleeping mats, sheets, clothing

and few personal items were gone through and thrown on the floor. Items guards claimed were contraband were seized, including items bought at the jail commissary. The guards tore up everything and left.

22.     The "recreation area" where we were held during shake downs was like a concrete swimming pool with no water. From there we could see and hear the guards shouting as they tore up our stuff.

23.     This was not for the safety of guards and prisoners but sheer harassment. I overheard one guard say, "We ought to go shake down O-POD. That'll really piss them off."

24.     I filed grievances while I was in jail and kept a daily record. This infuriated some of the guards, especially Deputy Miller. He was the worst of the guards, he claimed that it was policy that "…nothing come back from detail".

25.    I wanted to file a grievance against him, but they would not give me the form. It got to where I was about to file a grievance about not being able to file a grievance.


26.    Deputy Miller took my notes, pens, paper and food I bought at the commissary. He said he did not "recognize" any of the items as being from there.

27.    I started carrying my notes, so they would not be read and taken by the guards, but when Deputy Miller searched me and found my notes there was a problem. Deputy Miller was angry that I kept a journal. He told me I could not carry any items even though other inmates carried things.


28.    Deputy Miller and Deputy Calfee-Vittetoe threw away my addresses and phone numbers so I did not have contact information. They threw away contact info for the investigating detective and my public defender, as well as my motions. I especially needed my pastor's address and phone number because he tried to help me. When he spoke with my public defender Hildebrand, H. said "…he will not plead guilty". My pastor told him that was because I was innocent. My pastor wanted me to mail him my charges, bonds, fines and other general info about my case.

29.     I needed stamps and envelopes to maintain contact with the outside

world. Because I could not afford to buy them at the commissary, I asked

my sister to send these items. When she did, the jail notified me these items

were contraband and from then on blocked all my mail.

30.     Sometime before Miller incident sergeant Simms came to the medical

pod and watched me for 10 min while I was making notes from the

newspaper of information I wanted to check out when I got out of jail.

(8/?/2015) she carried on as if she was talking to one of the deputies, but I

knew she was watching me.

31.     The day before Miller claimed I assaulted him, (8/6/2015), he came to the

medical pod where I worked as a "feeder" for ill inmates and did other

duties. He watched me for about 10 minutes. He was supposed to be

supervising workers in the main housing. There was no reason for him to be

in medical pod.

32.     The next day after work, (8/7/2015), detail Deputy Miller ordered me to

put my hands on the wall while he searched me. He was ready to start

something. Suddenly he said I "assaulted" him. He snickered. He handcuffed

me and injured my hands with what felt like a piece of metal, all the time

saying I was "weird" and needed "mental help".


33.    He then forced me to sit on a bench, chained me to the bench where he

slammed my right foot into the floor and cuffed my ankles as tightly as the

cuffs would go leaving little circulation.

34.    Deputy Calfee-Vittitoe claimed that "…when making little notes on

sheets of paper it becomes trash" referring to my notes and logs.


35.    They also diverted their attention to my bible and shook all the notes of

the scriptures out.


36.    We were in an area with security cameras, but a video of the alleged

assault was never produced.


37.    Deputy Miller called Sergeant Sims and said one of their codes.

When the Sergeant arrived, they went into an office and closed the door.

About ten minutes later they came out. I told the sergeant that Deputy Miller

attacked me. She was not interested in my explanation, rather than hearing

my side of the incident she was very combative as if I somehow deserved all of this over pens and paper. (Even though other inmates carried books, notes, and sometimes even a bible). I told them that when I got out, I would file a real grievance.

38.    I was taken to medical. Deputy Miller did not request or receive medical treatment for the alleged assault.

39.    The week of September 11th, 2015 I wrote the medical department requesting a doctor's report for the incident regarding Deputy Miller but received no response.

40.    I never went to court for this assault. It was handled in house. I was put in solitary confinement for fighting and resisting a jailer. Sergeant Sims had me sign a paper after my time in solitary.

41.    I was told by a guard (I cannot remember his name he was the one who bragged about having all the guns and chains just before I went to solitary)

that the usual time in solitary for assaulting a guard was 60 days but because I had been such a good prisoner I would get only 7 days.

    a.  The penalty for assaulting a correctional officer is not up to 60 days of solitary confinement as determined by jail staff.

    b.  Georgia Code16-10-24 - Obstructing or hindering law enforcement officers: Whoever knowingly and willfully resists, obstructs, or opposes any law enforcement officer, prison guard, correctional officer, community supervision officer, county or Department of Juvenile Justice juvenile probation officer, probation officer serving pursuant to Article 6 of Chapter 8 of Title 42, or conservation ranger in the lawful discharge of his or her official duties by offering or doing violence to the person of such officer or legally authorized person is guilty of a felony and shall, upon conviction thereof, be punished by imprisonment for not less than one nor more than five years.

42.    I have a copy of the jail charges against me for "fighting and resisting staff" and "refusal to obey" and that the penalty for each is 30 days in solitary. I also kept copies of all the grievances I filed.

43.     Three times a month we were taken to a holding cell for possible court

hearings. I had not spoken with a public defender or had any bond reduction

hearings. We were roused at 4:00 am and taken to a small holding cell in the

jail where we sat until 7:00 am. For breakfast we got grits and powder eggs.

This was the only time in jail we were given orange juice. We were then

bused to court where we sat in a smaller cell than the one, we just left. At

7:30 am we were given a sack lunch of bologna sandwiches. This was the

only food we had all day. The only water we had to drink was from a

fountain attached to the toilet. We usually sat in this cell until 5:00 pm. I

went all those times for a court hearing that never happened.

44.     I tried to get information from the court for filing lawsuits, grievances

and requests but was told in a letter from court there was no information for

that. I wanted to start my civil action since state court was not interested in

justice or truth.  (see exhibit 6 state inquiry)


45.     Additionally, Because of Hildebrand's failure to provide competent

counsel I attempted to move my case forward by filing motions. (see Cobb

Police complaint)

46.    The jail denied and limited resources because I was not a pro se inmate.

(see exhibit 5 –grievance library)


47.    No remedies for any of my grievances.  Limits of Law Library,

Antagonizing guard Deputy Miller, case not heard by veteran's

accountability court, all were administratively exhausted and jail staff

considered the matters 'closed'.  (see exhibit 5- grievances)


48.    Not being able to file appeal after conviction.

49.    I wrote to the Lawyers Guild and Commissioner Cupid but heard nothing

from them, just as I heard nothing about my request for my case to be heard

in Veterans court.


## Relief

50.    Plaintiff realleges the allegations set forth in paragraphs 1-48 of this

complaint. Cobb County Defendants Sergeant Simms, Deputy Miller,

Deputy Calfee-Vittetoe, Deputy who interviewed plaintiff before going to

solitary, Assistant Solicitor Chris Lanning, Assistant Solicitor Mimi Scaljon,

Public Defender John A. Hildebrand, Public Defender Cliff Grainger, Cobb

County Board of Commissioners, Cobb County Manager, Cobb County

Public Safety Director intentionally and unlawfully deprived plaintiff of his liberty and continued prosecution by

a. Cruel unusual punishment

b. Involuntary servitude-Worked but not paid even though not convicted or even went to trial. -13th amendment

c. Health hazards-Rapiscanner

d. Lab for social experimentation through a controlled environment.

e. Public safety undermined by the pursuit of convictions.  One inmate bragged about the fact that he knew ICE would not pick him up.

f. Attacked by Deputy Miller; ASSAULT AND BATTERY.

g. Calfee-Vittetoe negligence in aiding Miller by shaking notes out of bible to harass and intimidate instead of finding out what happened.

h. S. Simms negligent by angrily scolding me for carrying pens not an inkling of concern as to what facts of the incident were.

i. Deputy who interview plaintiff before going to solitary bragged about having all the guns and chains instead of facts of the incident.

j. Ignored when requested a medical report of the incident.

k. Attack occurred in sally port, but no video was produced. Violation of the 14th Amendment cruel and unusual punishment and excessive force.

l.  Kangaroo hearing; predetermined guilt.

m. 7 days in solitary confinement

n.  Mail keeps being returned.

o.  Because of Hildebrand's failure to provide competent counsel I
    attempted to move my case forward by filing motions.  The jail denied
    and limited resources because I was not a pro se inmate.

51.    Grievances all administratively exhausted and jail staff considered the
       matters 'closed'.

       a.  Law Library

       b.  Antagonizing guard

       c.  Case not heard by veteran's accountability court

52.    After acquittal/release I sat in jail for another 5 hours.

53.    Plaintiff realleges and incorporates herein by reference each and every
       allegation contained in paragraphs 1 through 51of this complaint. Cobb
       Defendants named herein unlawfully deprived John Jacobs of his
       constitutional rights and caused additional prosecution to be instituted by

       a.  Exposing him to the known to be dangerous Rapescanner.
       b.  Notices mail keeps being sent back after writing the judge.

    c. Cruel antagonizing guards
    d. Watched the plaintiff the day before the attack.
    e. Falsely accused him of attacking a guard.
    f. Plaintiff was mocked, humiliated and threatened by guards after the incident.
    g. Kangaroo hearing where I was not able to defend myself nor was a lawyer present.
    h. Grievances.

54.    Pursuant to O.C.G.A. § 51-7-4 Lack of probable cause, question for jury,

O.C.G.A. § 51-7-1. Right of action for false arrest, O.C.G.A. § 51-7-40

Right of action for malicious prosecution plaintiff has right of action.

55.    Plaintiff filed a claim using S.F.95 and sent ante litem letter pursuant to

O.C.G.A §§ 36-11-1, O.C.G.A. 36-33-5, O.C.G.A. 50-21-26 (2010) et. seq.

and received no response.

56.    Pursuant to O.C.G.A. § 51-7-47 Measure of damages by the

circumstances of each case, plaintiff is entitled to all applicable damages

under;

    a. O.C.G.A.§ 51-12-5.1Punitive damages
    b. O.C.G.A§ 51-12-3 - Direct and consequential damages
    c. O.C.G.A§ 51-12-4 - Damages given as compensation for injury
    d. O.C.G.A. § 51-12-5. Additional damages for aggravating circumstances
    e. O.C.G.A. §16-5-42False imprisonment under color of legal process
    f. 42 U.S.C. § 1983 Pp 34-38
    g. 42 U.S.C. § 1985 (2)(3)

h. The <u>Fourth Amendment</u> (1791) protects people against unreasonable searches and seizures of either self or property by government officials
i. The <u>Fifth Amendment</u> (1791) due process of law
j. The <u>Sixth Amendment</u> (1791) provides several protections and rights to an individual accused of a crime. The accused has the right to a fair and speedy trial.
k. The <u>Thirteenth Amendment</u> (1865) involuntary servitude, as punishment for a crime.
l. The <u>Fourteenth Amendment</u> (1868) a state shall not violate a citizen's privileges or immunities; shall not deprive any person of life, liberty, or property without due process of law; and must guarantee all persons equal protection.

57.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 51 of this complaint. Defendants Sergeant Simms, Deputy Miller, Deputy Calfee-Vittetoe, and Deputy who interviewed plaintiff before going to solitary conspired to maliciously intimidate defendant.  In Hudson v. McMillian, 503 U.S. 1 (1992), The Court held that it is a violation of the Eighth Amendment when an action is not applied "in a good faith effort to maintain or restore discipline" but instead is used to "maliciously and sadistically cause harm." Plaintiff was mocked in jail by guard after being attacked, he was called "weird" and "...in need of a psychological exam" while another guard bragged about "...having all the guns and chains." These actions are not required to restore order, but specifically to harass and intimidate.

58.    Injury to hands. Plaintiff realleges and incorporates herein by reference

each and every allegation contained in paragraphs 1 through 51 of this

complaint.  Defendant Deputy Miller committed the act of assault and

battery, injured the plaintiff's hands by grinding a chain into them in order to

harass and intimidate.  This is intentional infliction of emotional distress.


59.    Abuse of process.  Wolff v. McDonnell , 418 U.S. 539 (1974), outlines

disciplinary procedures as  (1) written notice of the disciplinary violation;

(2) the right to call witnesses at their hearing; (3) assistance in preparing for

the hearing; (4) a written statement of the reasons for being found guilty; and

(5) a fair and impartial decision-maker in the hearing.  The defendants went

into an office closed the door then decided among themselves that the

plaintiff was guilty.  The alleged attack happened in the sally port however

no video was produced.  The plaintiff was not told why he was found guilty,

nor was there an impartial decision-maker in the discussion.  The deputy

who bragged about chains and guns was only interested in telling the

plaintiff of his presumed guilt similar to police, prosecutors and public

defenders in the Cobb police complaint.  (see Cobb Police complaint)

60.    Gross Negligence.  In South v. Gomez, No. 99 -15976, 2000 U.S. App. LEXIS 3200 (9th Cir. 2000) The Ninth Circuit held that the right at issue is the general standard under the Eighth Amendment: the right not to have prison officials act with deliberate indifference.  The plaintiff was repeatedly exposed to the known to be dangerous Rapiscanner. Since these machines are provided by the federal government, they are a federal issue.

61.    In Hudson v. Palmer, 468 U.S. 517, 530 (1984), a prison official searches your cell just to harass you or for some other reason that is not justified by a penological need, may be a Fourth Amendment violation. In Scher v. Engelke, 943 F.2d 921, 923-24 (8th Cir. 1991), a prison guard searched a prisoner's cell 10 times in 19 days and left the cell in disarray after three of these searches. The excessive searches in my case were harassment.

62.    Drug test. The plaintiff does not do drugs, the case was not a drug case but was subject to several drug test while in custody.  Once again referencing Hudson v. Palmer, 468 U.S. 517, 530 (1984) and Scher v. Engelke, 943 F.2d 921, 923-24 (8th Cir. 1991), to show that excessive searches is harassment and violation of the 4th Amendment.

63. As a direct and proximate result, Plaintiff suffered damages including, without limitation, shame, humiliation, anxiety, personal injuries, loss of time from work, diminished earning capacity in his profession, embarrassment, costs of legal defense and investigation expenses, and mental wellbeing in the investigation and pursuit of this action.

WHEREFORE, plaintiff respectfully requests that this court enter judgment granting plaintiff:

    a.  A declaration that the acts and omissions described herein violated plaintiff's rights under the Constitution and laws of the United States.

    b.  Damages as the court deems, compensatory and punitive in the amount of $121,000 against each defendant where applicable.

    c.  A jury trial on all issues triable by jury

    d.  Plaintiff's costs in this suit

    **e.**  Any additional relief this court deems just,

64.   Defendants receive federal funds and waive immunities.

Dated this [28th day of November 2018]

John Ethen Jacobs, Pro Se
1504 Colt Ridge Ln
Mableton, Ga 30126
(678)-949-8519
(404)-615-3866